STATE of Maine

v.

John CYRAN.

Supreme Judicial Court of Maine.

Submitted on Briefs Jan. 4, 1991.

Decided Feb. 25, 1991.

David W. Crook, Dist. Atty. and William Baghdoyan, Asst. Dist. Atty., Skowhegan, for plaintiff.

John Cyran, pro se.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD and BRODY, JJ.

ROBERTS, Justice.

John Cyran appeals from his convictions in the Superior Court (Somerset County, *Chandler, J.*), on two counts of fraudulently obtaining resident hunting, fishing and trapping licenses, 12 M.R.S.A. § 7373 (1981), and one count each of aggravated forgery, 17–A M.R.S.A. § 702 (1983), and false swearing, 17–A M.R.S.A. § 452 (1983 and Supp.1990). Cyran contends that he was denied his right to counsel, effective assistance of counsel, a fair trial because of "misconduct" on the part of the prosecution and his right to be free from double jeopardy. He also challenges the sufficiency of the evidence on all counts. We reject all of Cyran's contentions with regard to his convictions on fraudulently obtaining a license and false swearing. We do not find, however, sufficient evidence of aggravated forgery. Accordingly, we vacate Cyran's conviction on that charge.

Beginning in 1983 John Cyran claims he spent the period between April and January of each year in Maine. Cyran claims that he came to Maine in 1983 and decided to establish his domicile here. In 1984, game warden Glen Feeney of Jackman first became aware of Cyran's presence when Cyran tried to purchase an in-state hunting license. Feeney denied Cyran's request because he did not believe that Cyran was a resident, but merely a hunter who spent time in the area during hunting season. Feeney subsequently encountered Cyran in Maine on "around" ten occasions between 1984 and 1987.

In September 1987 Feeney discovered that Cyran had tagged a bear with a resident trapping license and began an investigation into his residency status. He began by traveling to the residence of a friend of Cyran's where he noticed a van tagged with New York plates. Feeney noted the plate numbers and contacted the New York authorities who confirmed that the van was registered to Cyran. They also returned information that Cyran had a house and in excess of thirty vehicles registered in his name in New York. After further investigation, Feeney became convinced that Cyran did not meet State of Maine residency requirements. Feeney then obtained an arrest warrant for Cyran, which he carried out in November 1987.

At the time of his arrest, Cyran was in possession of a resident combination hunting and fishing license as well as a resident trapper's license. Cyran was charged with fraudulently obtaining both of these licenses in violation of section 7373. Feeney testified that prior to asking Cyran any questions he read him his *Miranda* rights and Cyran indicated that he understood them, "had nothing to hide," and would answer questions without an attorney present. Subsequently on the seventy mile drive from Long Pond to the county jail in Skowhegan, Feeney turned on a tape recorder and taped the first forty-five minutes of the conversation he had with Cyran. During the conversation, Cyran insisted that he was a resident. He admitted, however, that he owned numerous vehicles and a house in New York State that he did not intend to sell.

At his arraignment on November 25, 1987, Cyran completed and swore to a Financial Affidavit form pursuant to his request for court appointed counsel. In this Financial Affidavit, Cyran stated that he owned no real estate, motor vehicles or other personal property. Cyran was subsequently indicted on one count of aggravated forgery, and one count of false swearing in connection with this Financial Affidavit. These two charges were subsequently consolidated with the pending complaints for trial in the Superior Court.

After receipt of the Financial Affidavit, the District Court had appointed an attorney for Cyran. In January 1989 his appointed attorney was relieved of appointment due to the appearance of retained

counsel. After Cyran was tried before a jury and convicted on all counts, he filed a timely notice of appeal. The court later found Cyran not to be indigent and granted his request to proceed pro se on this appeal.

## I.

Cyran argues that the "nature" of the charges against him somehow denied him his sixth amendment right to counsel. The facts of the case, however, show that Cyran was able to secure retained counsel. As a result we decline to address this argument on appeal. Cyran also argues that his lack of access to counsel on appeal was a denial of his right to counsel. This argument is without merit because he elected to proceed pro se.

■ Cyran has also made numerous arguments that he was denied effective assistance of counsel. We refuse "to review claims of ineffective assistance of counsel on *direct appeal*, except in cases where the appeal record shows beyond the possibility of a rational disagreement that the defendant was inadequately represented, leaving defendant to seek relief through post-conviction proceedings." *State v. Clements*, 431 A.2d 67 (Me.1981). Similarly the United States Supreme Court has held that a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1985). Cyran's claims of ineffective assistance of counsel show neither inadequate representation "beyond a possibility of rational disagreement" nor do they show unprofessional errors that would have changed the outcome of the trial. We therefore decline to address any of Cyran's claims of ineffective assistance of counsel.

## II.

Cyran also contends that he was denied due process when the Court allowed the prosecution to play selected portions of the tape recording of Cyran's conversation with Feeney to the jury in the rebuttal phase of the trial. Cyran challenges this admission on the grounds that: 1) the tape was made in violation of federal and state wire and oral interception rules; 2) the conversation itself was a violation of his *Miranda* rights; 3) he was denied due process when the court ruled that the jury would hear only portions of the tape and; 4) a proper chain of custody for the tape was not presented.

■ Although Cyran is unclear about which federal guidelines apply here, he specifically argues that 15 M.R.S.A. § 712 (Supp.1990) should be interpreted as preventing the admission of surreptitiously taped conversations. Nevertheless, both Maine's wiretap regulations, 15 M.R.S.A. §§ 709–712, and the applicable federal provision, 18 U.S.C. § 2511(2)(c), govern only conversations that were recorded by someone not a party to the communication.

■ Cyran also complains that the taped confession was made before he received *Miranda* warnings. At trial, however, Feeney testified that he gave Cyran his *Miranda* warnings and Cyran *never* contested this assertion. Because Cyran failed to raise the *Miranda* issue at trial, we will review the admission of the tape for obvious error. *State v. Smith*, 394 A.2d 259 (Me.1978). We find that even if Cyran had contested the admission of the tape on this ground, the court could reasonably have believed Feeney's testimony. There was thus no obvious error in admitting the confession.

■ According to Cyran, the court also erred in permitting the State to play portions of the tape recorded conversation as rebuttal evidence. We have held, however, that rebuttal testimony is proper if it "contravenes, antagonizes, confutes, or controls the inference sought to be drawn by new facts introduced by the adverse party at the next previous stage," *Payson v. Bombardier, Ltd.*, 435 A.2d 411, 413 (Me.1981). Moreover, M.R.Evid. 106 leaves to the court's discretion when to compel a party to present all, as opposed to part, of a recorded statement. Cyran makes no showing of prejudice other than his unsub-

stantiated assertion that the jury would "speculate" about reasons for the tape's editing. We note that Cyran did not request any curative instruction and we conclude the court acted within its discretion in allowing the tape to be played in part. *See State v. Libby*, 546 A.2d 444, 447–449 (Me. 1988).

Cyran also contests the prosecution's showing of a proper chain of custody for the tape. The general rule, however, is that a tape is admissible if a witness to the conversation testifies that the recording is accurate. *See* McCormick, *McCormick on Evidence 3d Ed.* § 214, p. 675 (1984). At trial, Feeney testified that the tape had been in his possession since the arrest and that he had listened to the tape prior to trial and believed it to be the "exact same tape" of the conversation he recorded. This testimony established a sufficient foundation on which to admit the tape.

### III.

■ Cyran protests that the failure of the prosecution to turn over before trial a letter from the clerk of the Town of Kennebunk "severely prejudiced" his case. The record shows that Cyran did not preserve his objection to the admission of this evidence and we review it for obvious error. M.R.Evid. 103(d); M.R.Crim.P. 52. Because this was but one piece of a large amount of evidence tending to show that Cyran was not a resident, we find no obvious error in admitting the letter.

### IV.

■ In reviewing claims of insufficiency of evidence we must decide, after examining all of the evidence in the light most favorable to the State, whether "any trier of fact rationally could find beyond a reasonable doubt every element of the offense charged." *State v. Barry*, 495 A.2d 825, 826 (Me.1985). We find that there was enough evidence presented in this case for a jury rationally to find Cyran guilty of the charges of fraudulently obtaining the licenses and of false swearing.

■ The State presented no evidence, however, that Cyran committed aggravated forgery in violation of 17–A M.R.S.A. § 702 (1983). Section 702 states in relevant part that:

1. A person is guilty of aggravated forgery if, with intent to defraud or deceive another person or government, he falsely makes, completes, endorses or alters a written instrument, or knowingly utters or possesses such an instrument, and the instrument is:

D. A public record or an instrument filed or required or authorized by law to be filed in or with a public office or public employee.

Section 701(2) and (3) provide the relevant definitions:

2. A person "falsely completes" a written instrument when, by adding, inserting or changing matter, he transforms an incomplete written instrument into a complete one, without the authority of anyone entitled to grant it, so that such complete instrument appears or purports to be in all respects an authentic creation of, or fully authorized by, its ostensible author, maker or drawer;

3. A person "falsely makes" a written instrument when he makes or draws a complete written instrument in its entirety, or an incomplete written instrument, which purports to be an authentic creation of its ostensible author, maker or drawer, but which is not such, either because the ostensible maker or drawer is fictitious or because, if real, he did not authorize the making or drawing thereof.

Although the State proved that Cyran intentionally provided false information in a document to be filed with the court, that conduct did not constitute "falsely making" or "falsely completing" as defined in section 701. The affidavit filed by Cyran was "an authentic creation of its ostensible author," albeit one containing false information. Cyran did not "falsely make" the document because he did not create a document that falsely purported to be the authentic creation of another. Moreover, he did not "falsely complete" the document

because he did not make an unauthorized addition to the document in such a manner that the document falsely appeared to be the complete creation of another. In sum, Cyran's inclusion of false information did not, by itself, create a document falsely purporting to be the authentic creation of another. Thus, the State failed to prove a violation of section 702.

Because we vacate Cyran's conviction for aggravated forgery we need not discuss Cyran's contention that his convictions of both aggravated forgery and false swearing constituted double jeopardy.

The entry is:

In CR 88–425: Judgment on count I (Aggravated Forgery) vacated and remanded for entry of a judgment of acquittal.

Judgment on count II affirmed.

In CR 88–343: Judgment affirmed.

In CR 88–344: Judgment affirmed.

All concurring.