MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2019 ME 60
Docket:       Som-18-194
Argued:       March 5, 2019
Decided:      April 23, 2019

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

STATE OF MAINE

v.

LUC W. TIEMAN

JABAR, J.

[¶1]  Luc W. Tieman appeals from a judgment of conviction of murder, 17-A M.R.S. § 201(1)(A) (2018), entered by the court (Somerset County, *Mullen, J.*) following a jury trial.  Tieman contends that the court abused its discretion by admitting Facebook Messenger records in evidence, and he challenges the sufficiency of the evidence to support the jury's verdict.  We affirm the judgment.

## I.  BACKGROUND

[¶2]  "Viewing the evidence in the light most favorable to the State, the jury rationally could have found the following facts beyond a reasonable doubt."  *State v. Perkins*, 2019 ME 6, ¶ 3, 199 A.3d 1174 (quotation marks omitted).

[¶3] In August 2016, Tieman and his wife, the victim in this case, returned to Maine after visiting the victim's family in South Carolina. At that time, Tieman and the victim were living at Tieman's mother and father's home in Fairfield, Maine. On August 24, 2016, Tieman was seen by several people with another woman with whom he had begun communicating on Facebook a week earlier. On the night of August 24, 2016, Tieman had sex with her. On that same night, the victim called Tieman thirty-one times between 5:46 p.m. and 10:22 p.m.

[¶4] The following day, August 25, 2016, a friend of both Tieman and the victim contacted the victim using Facebook's messaging platform, "Facebook Messenger." The friend informed the victim that Tieman was "getting caught up in other women and saying [that] they were separated." The victim responded to the friend, stating in several messages that Tieman had "broke[n] [her] heart," but that "it [would] all work out [because] God has a plan," and that Tieman would "never find a better woman than [her]" and he had "lost [her]."

[¶5] On August 26, 2016, Tieman moved into the home of the woman with whom he was having an affair and informed her that the victim had run off with another man. The same day, the victim's parents became concerned about the victim because she was not responding to their calls, text messages, or

Facebook messages.  In an attempt to communicate with the victim, the parents reached out to Tieman and asked how he and the victim were doing.  Tieman responded the following day, stating: "We are good.  Thank you.  Love her so much . . . ."

[¶6]  On September 8, 2016, the parents of the victim had still not heard from her, so they called Tieman's father, who informed them that the victim was missing.  The victim's parents then called Tieman, asking why he had not told them that the victim was missing.  Tieman stated: "I was waiting for her to contact you because I still would never bad mouth her.  I still love you all."

[¶7]  The following day, September 9, 2016, the victim's father filed a missing person report with the Fairfield Police Department.  Tieman explained to the victim's father, to Fairfield police, and to Maine State Police detectives that he had driven to Wal-Mart with the victim, had gone into the store alone, and when he had returned to the vehicle the victim had been gone.[1]

[¶8]  On September 20, 2016, a search warrant was executed at the Tieman family home in Fairfield.  Police dogs trained to detect human remains were employed at the scene and approximately five minutes into the search a

---

[1]  Law enforcement reviewed video surveillance footage of the Wal-Mart parking lot, but the recordings did not show Tieman's vehicle, Tieman, or the victim.

4

police dog discovered a burial site behind the Tieman family home. The victim's body was in the burial site; she was wrapped in a blanket and buried with an assortment of items. Among those items was a note written to "Joy-Joy" from "LUC-e-DA-Bear" which stated, in part: "forever I love you for always. . . . Rest in peace . . . . I can't wait to be with you and see you and hold you again."

[¶9] Around the same time that the victim's body was exhumed, detectives questioned Tieman about the body. Tieman stated that the victim had died of an overdose and he had buried her in the backyard with a note and some flowers. Tieman also stated that the victim had suffered no physical injuries. However, an autopsy performed on September 21, 2016, revealed that the cause of the victim's death was gunshot wounds of the head and neck. Fragments and a portion of the jacket of a .45 caliber bullet were discovered in the victim's head during the autopsy, and a .45 caliber handgun had been seized from the Tieman residence during the execution of the search warrant on September 20, 2016.[2]

[¶10] Tieman was arrested on September 21, 2016, and indicted on October 27, 2016, for the murder of the victim. Following a six-day trial, the

---

[2] The bullet recovered from the victim's head during the autopsy was fired from the .45 caliber handgun that had been seized on September 20, 2016, and submitted to the Maine State Police Crime Laboratory. Tieman purchased this .45 caliber handgun in December 2015.

jury returned a verdict of guilty on April 9, 2018. Tieman was sentenced to a term of fifty-five years' imprisonment with the Department of Corrections. This timely appeal followed.

## II. DISCUSSION

A.      Facebook Messenger Records

[¶11]   Tieman raises two challenges to the court's admission of the Facebook Messenger records, which were offered and admitted as State's Exhibit 74A over Tieman's objection. First, he contends that the court clearly erred or abused its discretion in finding that the Facebook Messenger records were authenticated pursuant to M.R. Evid. 901. Second, he asserts that the court abused its discretion by admitting the Facebook Messenger records pursuant to the hearsay exception that allows for the admission of a declarant's statement of his or her then-existing state of mind. *See* M.R. Evid. 803(3).

[¶12] We review a trial court's ruling on the admissibility of evidence for clear error or abuse of discretion. *See State v. Berke*, 2010 ME 34, ¶ 10, 992 A.2d 1290. "We review a trial court's ruling to admit or exclude alleged hearsay evidence for an abuse of discretion" and "will find an abuse of discretion if a party can demonstrate that the trial court exceeded the bounds of the reasonable choices available to it." *Guardianship of David P.*, 2018 ME 151, ¶ 6,

6

196 A.3d 896 (quotation marks omitted); *see also State v. Watson*, 2016 ME 176, ¶¶ 10-11, 152 A.3d 152. We afford broad discretion to the trial court in its determination on the admissibility of evidence. *Guardianship of David P.*, 2018 ME 151, ¶ 6, 196 A.3d 896.

    1.    M.R. Evid. 901

[¶13] Beginning with Tieman's challenge to the court's finding that the Facebook Messenger records were authenticated, Rule 901 requires that a proponent of evidence "produce evidence sufficient to support a finding that the item is what the proponent claims it is." M.R. Evid. 901(a). Maine's standard for authenticating evidence pursuant to Rule 901 is "identical to that set forth in the Federal Rules of Evidence" and "embodies a flexible approach to authentication reflecting a low burden of proof." *Berke*, 2010 ME 34, ¶ 11, 992 A.2d 1290 (quotation marks omitted). Testimony from a witness with knowledge that electronically stored information is what it is claimed to be is an adequate method of authentication. *See* M.R. Evid. 901(b)(1); *State v. Webster*, 2008 ME 119, ¶ 20, 955 A.2d 240; *State v. Churchill*, 2011 ME 121, ¶ 8,

32 A.3d 1026. "Electronic evidence is held to the same standard of authentication as other evidence." *Churchill,* 2011 ME 121, ¶ 6, 32 A.3d 1026.

[¶14] Contrary to Tieman's contentions, the court did not err or abuse its discretion in its determination that the Facebook Messenger conversation was authenticated through the testimony of the person with whom the victim was communicating. *See id.* ¶ 8 ("The hallmark of authentication pursuant to M.R. Evid. 901(b)(1) is assurance from the witness that the chat log offered in evidence is a true and accurate representation of the chat as it occurred. It is then up to the jury to decide whether to believe the witness." (citation omitted)); *see also* Field & Murray, *Maine Evidence* § 1001.1 at 560 (6th ed. 2007) ("Questions about the integrity of electronic data generally go to the weight of electronically based evidence, not its admissibility.").

2.   M.R. Evid. 803(3)

[¶15] Turning to Tieman's challenge to the court's admission of the Facebook Messenger records, Rule 803(3) provides that "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)" is "not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness." M.R. Evid. 803(3). Hearsay

statements of a declarant's then-existing state of mind are admissible in a criminal prosecution if they are "highly relevant and uttered in circumstances indicating its truthfulness above and beyond the reliability presumed of all statements of present mental state." *State v. Cugliata*, 372 A.2d 1019, 1027 (Me. 1977); *see also State v. Atwood*, 2010 ME 12, ¶ 28, 988 A.2d 981. "The premise for admitting hearsay statements evidencing state-of-mind is that such statements are reliable because of their spontaneity and the resulting probable sincerity." *Horton v. Allen*, 370 F.3d 75, 85 (1st Cir. 2004) (quotation marks omitted).

[¶16] Tieman contends that the messages sent by the victim do not fit within the hearsay exception for a declarant's then-existing state of mind pursuant to M.R. Evid. 803(3). The Facebook Messenger conversations contained in State's Exhibit 74A include statements made by the victim and the friend who reached out to the victim. The court found that the victim's statements were admissible as "an exception to the hearsay rule under [M.R. Evid. 803(3) because] it is a statement of [the victim's] existing state of mind and emotion . . . ." The court did not make any findings regarding the statements made by the friend that were contained within the Facebook Messenger records, but Tieman conceded at oral argument that he is not challenging the

admissibility of those statements.[3]  Thus, the focus of our analysis is solely on the admissibility of the messages sent by the victim.

[¶17]  Pursuant to Rule 803(3), statements of a declarant's then-existing state of mind or emotion are admissible as an exception to the rule against hearsay, whereas statements of memory—pointing backwards to the past—are not admissible under that Rule.  *See State v. Williams*, 395 A.2d 1158, 1163-64 (Me. 1978).  In this case, some of the victim's statements contained in the Facebook Messenger conversation express her then-existing state of mind and emotion—for example, the victim stated: "[we] still do have a good relationship" and "[h]owever it will all work out, God has a plan" and "[h]e will never find a better woman than me."  However, the Facebook Messenger conversation also contains statements by the victim that referred to past incidents and looked backward, for example: "[h]e broke my heart and wouldn't tell me who he kissed because I mentioned that I would kill her" and "he lost me."

---

[3] Moreover, after the court admitted the Facebook Messenger records, Tieman requested, against the advice of counsel, to have all of the Facebook Messenger records admitted, not just the two pages that the State had moved into evidence, which depicted the conversation between the victim and the friend.  The State did not object to Tieman's request, and all of the compiled Facebook Messenger records of the victim were admitted in evidence.

[¶18]  Assuming that the statements are hearsay,[4] and that some of the messages sent by the victim, that were related to past incidents, were improperly admitted under Rule 803(3), "it is highly probable the error did not affect the jury's verdict and the error was therefore harmless."  *State v. Donovan*, 1997 ME 181, ¶ 9, 698 A.2d 1045.  Considering the litany of evidence presented against Tieman, and the testimony of Tieman himself, "[t]here is enough admissible testimony to bar a conclusion that the contested out-of-court statement meaningfully influenced the verdict."  *State v. White*, 2002 ME 122, ¶ 16, 804 A.2d 1146.

B.    Sufficiency of the Evidence

[¶19]  Lastly, Tieman contends that there was insufficient evidence for the jury to find him guilty of murder.  We review a criminal defendant's challenge to the sufficiency of the evidence to support a conviction by "viewing the evidence in the light most favorable to the State" and determining "whether a trier of fact rationally could find beyond a reasonable doubt every element of the offense charged."  *State v. Hodgdon*, 2017 ME 122, ¶ 21, 164 A.3d 959 (quotation marks omitted); *see* 17-A M.R.S. § 201(1)(A).  "Direct evidence of a

---

4  There is, in fact, no indication that the victim's statements were being offered to establish that the defendant had "broken her heart," that "God has a plan," or that Tieman would never find a better woman.  The State, however, never asserted that these statements were not hearsay.

defendant's exact actions in committing a crime is not required," and "[a] conviction based on circumstantial evidence may be affirmed even if the inferences drawn from circumstantial evidence are contradicted by parts of the direct evidence." *State v. Hopkins*, 2018 ME 100, ¶ 52, 189 A.3d 741.

[¶20] The Deputy Chief Medical Examiner testified that the victim died as a result of two gunshot wounds to her head and neck—contrary to Tieman's statement to law enforcement that the victim had died of an overdose and that he buried her unwounded body. The evidence revealed that Tieman had purchased a .45 caliber handgun that was found in the residence where he and the victim were living, and that the .45 caliber handgun was used to fire the bullet of which fragments were recovered from the victim's head. The evidence also demonstrated that upon returning from South Carolina, Tieman began courting other women and began a sexual relationship with a woman the night before the victim was last heard from. The day after the affair and the victim's disappearance—which Tieman neglected to report to police—Tieman moved into the home of the other woman. Additionally, Tieman admitted to law enforcement and also at trial that he had buried the victim with an assortment of items, which were connected to Tieman by his statements to law enforcement, by his testimony at trial, and by video evidence admitted at trial.

[¶21]  Contrary to Tieman's contentions, there is ample evidence in the record—including but not limited to the above-referenced evidence—from which the jury rationally could have found every element of knowing or intentional murder proven beyond a reasonable doubt.  *See State v. Moores*, 2009 ME 102, ¶¶ 10-11, 982 A.2d 318.

## III.  CONCLUSION

[¶22]  In sum, the court did not err or abuse its discretion when it found the Facebook Messenger records to be authenticated, *see* M.R. Evid. 901, and admissible pursuant to the hearsay exception for a declarant's then-existing state of mind, *see* M.R. Evid. 803(3).  In addition, there is sufficient evidence in the record supporting the jury's verdict finding Tieman guilty of murder.

The entry is:

Judgment affirmed.

---

Clifford B. Strike, Esq. (orally), Strike, Gonzales & Butler Bailey, Portland, for appellant Luc W. Tieman

Aaron M. Frey, Attorney General, and Leanne Robbin, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Somerset County Unified Criminal Docket docket number CR-2016-1405
FOR CLERK REFERENCE ONLY